Rel: June 26, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2025-2026

———————————————

## CR-2023-0185

———————————————

## Jason Michael Osborn

## v.

## State of Alabama

## Appeal from Morgan Circuit Court
## (CC-19-1421)

On Return to Remand

MINOR, Judge.[1]

A jury convicted Jason Michael Osborn of capital murder for the death of Ricardo Brown, see § 13A-5-40(a)(2), Ala. Code 1975, and the jury, by a vote of 10 to 2, sentenced Osborn to death. The Morgan Circuit

---

[1]This case was previously assigned to another member of this Court before it was reassigned to Judge Minor.

Court entered a judgment on the jury's verdict. On appeal, Osborn raises 20 issues. We address two: (1) whether the district judge who presided over Osborn's trial was properly assigned to serve as a circuit judge and (2) whether plain error occurred when, during closing argument, the prosecutor stated: "[T]here's only two people that know what happened out there and one of them is dead." We hold that the judge who presided over Osborn's trial was properly assigned to serve as a circuit judge and that, even if her assignment expired before Osborn's trial, Alabama's statutory de facto officer doctrine defeats Osborn's claim. We also hold, however, that the prosecutor's comment was plain error. We thus reverse the circuit court's judgment and remand this cause for proceedings consistent with this opinion.

Facts and Procedural History

The State's evidence showed that around 4:30 a.m. on October 28, 2018, the Decatur Police Department received an emergency-911 call about a body in the road on Twelfth Avenue. (R. 554.) Responding officers found a critically injured man—later identified as Brown—on the side of the road. Brown was transported to a local hospital where he died shortly after 5:00 a.m.

2

The county coroner concluded that Brown, who had a blood-alcohol level of 0.221, had been hit by a car and died as a result. (R. 607-08.) The police investigated the death as a hit-and-run, but, despite multiple leads, the investigation stalled. (R. 644-54.)

In May 2019, jailhouse informants began telling the police that Osborn, who was in jail on a drug-possession charge, had murdered Brown. (C. 59-60; R. 668-70.) Jonathan Lorenza, who had known Osborn for nearly a decade and who had been friends with Brown, testified that he and Osborn, when they were in the community room of the jail, saw a local televised news story about the death of Brown. (R. 676.) Lorenza said the story caused Osborn to laugh and boast about how Brown had died. Osborn told Lorenza that he had killed Brown, explaining in detail how he had "robbed him and hit him with a pipe" and then "ran him over" and "drug him down the road." (R. 677, 681.)

Osborn told Lorenza that, after he killed Brown, he had "cut up and scrapped" the car he had used to run over Brown. (R. 679.) Osborn told Lorenza that, "[i]f he could go back, he'd get [Brown's] body and put it in an incinerator." (R. 679.)

Lorenza testified that he remembered seeing Osborn, around the

time of Brown's death, dismantle a white Nissan Altima. (R. 679-80.) Lorenza testified that he did not know if Osborn had used the white Altima to run over Brown. (R. 683-84.)

Robert Cooper, another inmate at the jail and a friend of Osborn, testified that, when he was nearing the end of his sentence, Osborn talked to him about "going to see" some people when Cooper got out of jail. (R. 791-93.) There were six people on Osborn's list, including Lorenza and Hillary Thompson. (R. 791-92, 796.) Osborn wanted Cooper to "persuade" those people not to testify against him. (R. 791-92.)

Cooper testified that Osborn showed him a copy of a list of witnesses and, pointing to Thompson's name, accused her of lying and not knowing anything. (R. 798.) Cooper testified that, during "pillow talk," Osborn had told Thompson about killing Brown. (R. 798.) Osborn wanted Cooper to, in Osborn's words, "put a steering wheel in her back and drive her," which Cooper understood to mean giving Thompson "dope" and keeping her high so that she would be unable to serve as a credible witness. (R. 798-99.) Osborn told Cooper that if Thompson "tried to come to court, she [could] become a member of the bumper club, just like the n----- she was testifying" for. (R. 800.)

4

Based on information from the informants,[2] the State exhumed Brown's body in October 2019 for an autopsy. The autopsy showed that Brown had multiple blunt-force injuries, including a "depressed skull fracture underlying a laceration that was seen externally on his scalp." (C. 555; R. 733, 742.) Dr. Jonrika Malone, who performed the autopsy, testified that, in her opinion, the skull fracture appeared to be more consistent with Brown's having been struck with a "cylindrical [object] like a pipe or a hammer," not necessarily from his having been struck by a vehicle and dragged along the road. (R. 737-41, 764, 774.) She admitted that the head injury could have been "a result of [Brown's] being struck by a car," but she described that possibility as "not likely." (R. 779, 781.) She found no "lower extremity injuries," such as "injuries or fractures to [Brown's] thighs or legs or ankles or feet." (R. 730.) But she found "multiple fractures in his chest as well as in his pelvis ..., and he had

---

[2]Over the course of the investigation, at least seven informants claimed that Osborn had killed Brown. (C. 59; R. 668, 798.) One informant, Dewayne "Jimmy" Isbell, claimed to have been in the front seat of Osborn's car when, he said, Osborn struck Brown in the head with a pipe and then ran over Brown with his car. (C. 59.) Less than two weeks before Osborn's February 2023 trial, however, the State informed Osborn's counsel that Isbell had told the prosecution that "he was not in the car on the night of the murder" and that "the detail[s] he relayed in his statement were provided to him by others." (C. 337.)

abrasions and contusions to his upper back" and arms. (R. 730.)

In December 2019, a grand jury indicted Osborn for capital murder during a robbery. (C. 11.) District Judge Shelly Waters, who had been assigned to serve as a circuit judge, presided over Osborn's February 2023 trial. At the guilt phase of the trial, the jury convicted Brown of capital murder. During the penalty phase, the jury found the presence of two aggravating circumstances: that the murder was committed during a robbery and that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. See § 13A-5-49(a)(4) and § 13A-5-49(a)(8), Ala. Code 1975. The State conceded two statutory mitigating circumstances: that Osborn had no significant criminal history and that he was young at the time of the crime. See § 13A-5-51(a)(1) and § 13A-5-51(a)(7), Ala. Code 1975. Osborn presented no mitigation evidence or argument to the jury. By a vote of 10 to 2, the jury sentenced Osborn to death. At Osborn's request, the circuit court held the sentencing hearing that same day and imposed the jury's death sentence. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-55, Ala. Code 1975.

Standard of Review

"Rule 45A, Ala. R. App. P., was amended on January 12, 2023, to state:

"'In all cases in which the death penalty has been imposed, the Court of Criminal Appeals may, but shall not be obligated to, notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.'

"Before Rule 45A was amended, this Court was required to conduct plain-error review in all cases in which the death penalty had been imposed. Although Rule 45A now provides that plain-error review is discretionary in such cases, this Court has explained that it will continue to conduct plain-error review in all cases in which the death penalty has been imposed. Iervolino v. State, 402 So. 3d 844, 862 (Ala. Crim. App. 2023). However, that does not mean that this Court will provide a detailed analysis, or even any analysis, of those claims that were not properly preserved for appellate review, as it historically did when plain-error review was mandatory. Id.

"The standard this Court employs in conducting plain-error review is well settled:

"'"'The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.' Hall v. State, 820 So. 2d 113, 121 (Ala. Crim. App. 1999), aff'd, 820 So. 2d 152 (Ala. 2001). Plain error is 'error that is so obvious that the failure to notice

7

it would seriously affect the fairness or integrity of the judicial proceedings.' Ex parte Trawick, 698 So. 2d 162, 167 (Ala. 1997), modified on other grounds, Ex parte Wood, 715 So. 2d 819 (Ala. 1998). 'To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So. 2d 199, 209 (Ala. Crim. App. 1998), aff'd, 778 So. 2d 237 (Ala. 2000). 'The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant.' Ex parte Trawick, 698 So. 2d at 167. '[P]lain error must be obvious on the face of the record. A silent record, that is a record that on its face contains no evidence to support the alleged error, does not establish an obvious error.' Ex parte Walker, 972 So. 2d 737, 753 (Ala. 2007). Thus, '[u]nder the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial.' Wilson v. State, 142 So. 3d 732, 751 (Ala. Crim. App. 2010). '[T]he plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."' United States v. Young, 470 U.S. 1, 15, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n.14, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982))."'

"Iervolino, 402 So. 3d at 862-63 (quoting DeBlase v. State, 294 So. 3d 154, 182-83 (Ala. Crim. App. 2018))."

Henderson v. State, [Ms. CR-21-0044, May 3, 2024] ___ So. 3d ___, ___

(Ala. Crim. App. 2024).

Analysis

I.   Judge Waters's assignment was proper. And even if her assignment expired before Osborn's trial, the de facto officer doctrine defeats Osborn's claim.

On appeal Osborn argues for the first time that Judge Waters, who serves as a Morgan District Judge, was not properly appointed to serve as a circuit judge and thus lacked jurisdiction over his case.[3] The record includes an August 3, 2021, order ("the Standing Order") in which Circuit Judge Charles B. Elliott, the then-Presiding Judge of the Morgan Circuit Court, assigned Judge Waters to serve as a "Special Circuit Judge … until January 4, 2023." (2d Supp. C. 14.) The record also includes a September 30, 2022, order ("the September 2022 Order") from Circuit Judge Jennifer M. Howell, in which Judge Howell granted Osborn's motion to continue a status conference and reassigned Osborn's case to Judge Waters to "hear this case as a Special Circuit Judge." (C. 216.) Judge Howell also directed the circuit clerk to "update the file

_____

[3]After oral argument, this Court, in an order issued on October 2, 2024, directed the circuit court to "supplement the record on appeal with any order or documents entered by the presiding judge of the Morgan Circuit Court assigning Judge Waters to preside over Osborn's capital-murder trial." See Rule 10(g), Ala. R. App. P.

accordingly," and the record shows this docket entry on September 30, 2022: "Changed from: JMH [Jennifer M. Howell] to SSW [Shelly S. Waters]." (C. 6.)

Osborn argues that Judge Howell had no authority to assign the case to Judge Waters because Judge Howell was not the presiding judge of the Morgan Circuit Court when she entered the reassignment order.[4] In support of his argument, Osborn cites § 12-1-14.1, Ala. Code 1975, Ex parte K.R., 210 So. 3d 1106 (Ala. 2016), Paulk v. Paulk, 249 So. 3d 521, 523 (Ala. Civ. App. 2017), and Bush v. State, 171 So. 3d 679 (Ala. Crim. App. 2014). In his supplemental brief after oral argument, Osborn argues that the Standing Order issued by then-Presiding Judge Elliott did not select a specific case to be assigned to Judge Waters and that Judge Howell had no statutory authority to assign a district judge to hear Osborn's capital-murder case. The State argues that this issue is not jurisdictional and thus is not properly before this Court because Osborn

---

[4]Judge Elliott was the presiding judge of the Morgan Circuit Court when Judge Howell entered the September 2022 order. Judge Howell was the presiding judge of the Morgan Circuit Court immediately before Judge Elliott. See State v. Murphy, 1 So. 3d 1084, 1086 n.3 (Ala. Crim. App. 2008) ("This Court may take judicial notice of the presiding judge in a particular circuit.").

10

did not object to the appointment. The State also argues that the reassignment was proper under Rule 13, Ala. R. Jud. Admin., and that, even if issues exist with Judge Waters's appointment or assignment, the de facto officer doctrine defeats Osborn's claim.

We begin with the statute cited by Osborn—§ 12-1-14.1, Ala. Code 1975, which became effective September 26, 2001:

> "(a) At the request of the affected judge in a particular circuit, the presiding circuit court judge of the circuit may appoint and commission a special circuit court judge, special district court judge, or special judge of probate <u>for temporary service</u>. The person so appointed shall possess the qualifications of the judgeship to which he or she is appointed. The special judge shall qualify by taking the oath of office prescribed in the Constitution of Alabama of 1901. The appointment shall confer on the special judge all powers, authority, and jurisdiction of the judgeship to which he or she is appointed. The special judge shall not receive compensation for his or her services.
>
> "(b) As used in this section, the term 'temporary service' means not more than 180 consecutive days. A special judge may be reappointed, as needed, for more than one period of 180 consecutive days."

(Emphasis added.) Section 12-1-14.1(a) allows a presiding circuit judge to "<u>appoint and commission</u>" anyone who "possess[es] the qualifications of the judgeship to which he or she is appointed" to serve as "a special circuit court judge, special district court judge, or special judge of probate

11

for temporary service," which subsection (b) limits to not more than 180 consecutive days. (Emphasis added.) A special judge under this section "shall not receive compensation for his or her services." The Standing Order, entered by then-Presiding Judge Elliott, did not comply with the 180-day "temporary service" limitation in § 12-1-14.1(b). But that does not end our inquiry.

Section 12-9A-8, Ala. Code 1975, which became effective July 1, 2018, provides:

> "(a) A presiding circuit judge, by order, may assign a circuit or district court judge who is within the circuit to serve within the circuit or within the district courts of the circuit. Before assigning a judge, the presiding circuit judge shall evaluate the needs of the circuit, including the currency, congestion, and backlog of criminal and civil cases.
>
> "(b) Assignments of judges by the presiding circuit judge shall be in writing and shall be sent to the assigned judge as soon as practicable. The presiding judge or the judge's designee may notify the assigned judge orally of the assignment. An oral notification of an assignment is sufficient until a written notification can be prepared and delivered to the assigned judge. A copy of each written assignment shall be filed with the Administrative Director of Courts and in the office of the clerk or register of the court to which the assignment is made.
>
> "(c) Except as otherwise provided by law or rule, the presiding judge may assign judicial secretaries, bailiffs, and court reporters in the judicial system within the circuit to service in the circuit or district court as the service may be

12

required.

"(d) This section shall not apply in Jefferson County.

"(e) It is the intent of the Legislature that pursuant to Amendment 328 of the Constitution of Alabama of 1901, now appearing as Section 150 of the Official Recompilation of the Constitution of Alabama of 1901, as amended, the Supreme Court of Alabama shall amend Rule 13 of the Alabama Rules of Judicial Administration to conform with the provisions of this section."

(Emphasis added.) Section 12-9A-8 allows a presiding circuit judge to "assign a circuit or district court judge who is within the circuit to serve within the circuit or within the district courts of the circuit." (Emphasis added.) Section 12-9A-8 is thus an assignment statute, not an appointment statute. Section 12-9A-8, unlike § 12-1-14.1, does not require assigned judges to take a new oath, it does not limit the time of their assignment, it does not prohibit them from being compensated, and it states the legislature's desire for the Alabama Supreme Court to amend Rule 13, Ala. R. Jud. Admin., to conform with § 12-9A-8.[5]

Before the enactment of § 12-9A-8, Ala. Code 1975, Rule 13(A), Ala.

---

[5]One of the dissenting opinions asserts that § 12-9A-8, Ala. Code 1975, "addresses the assignment of a specific case to a judge in a circuit made by the presiding judge." ___ So. 3d at ___ (Kellum, J., dissenting) (second emphasis added). But § 12-9A-8 says nothing about assigning a judge to a specific case.

13

R. Jud. Admin., stated:

> "The presiding circuit judge may <u>temporarily assign</u> circuit or district judges to serve either within the circuit or in district courts within the circuit."

(Emphasis added.) Applying that prior version of Rule 13(A), Ala. R. Jud. Admin., the Court of Civil Appeals emphasized that any assignment of a district court judge to sit as a circuit court judge must be temporary:

> "Rule 13(A), Ala. R. Jud. Admin., authorizes the presiding judge of a judicial circuit to 'temporarily assign circuit or district court judges to serve either within the circuit or in district courts within the circuit.' Our supreme court has interpreted Rule 13 as permitting a standing order providing for a district-court judge '<u>to temporarily sit in the circuit court when needed</u>.' <u>Ex parte Atchley</u>, 936 So.2d 513, 516 (Ala. 2006)."

<u>L.R.S. v. M.J.</u>, 229 So. 3d 772, 778 (Ala. Civ. App. 2016) (emphasis added).[6] After that decision and after the enactment of § 12-9A-8, the

---

[6]In <u>L.R.S. v. M.J.</u>, 229 So. 3d 772, 779 (Ala. Civ. App. 2016), the standing order at issue was void ab initio because it "effectively enlarge[d] the jurisdiction of the Mobile Juvenile Court to include ... cases ... that do not fall within the statutory jurisdiction of a juvenile court." The jurisdictional problem with the order in <u>L.R.S.</u>, however, was not that it purported to assign one particular district judge to serve as a circuit judge; instead it "purport[ed] to assign <u>an entire class of circuit-court cases</u>, i.e., 'all custody and visitation cases in this jurisdiction that do not arise out of a divorce action of modification or a divorce judgment,' to the 'District Court Judge who is currently also assigned to the Juvenile Court.'" 229 So. 3d at 778 (emphasis added). And the standing order, by having no expiration date, contravened the former version of Rule 13(A),

Alabama Supreme Court amended Rule 13, effective November 8, 2019, to provide:

> "A presiding circuit court judge, by order, may assign a judge who is within the circuit to serve within the circuit courts or within the district courts of the circuit. Before assigning a judge, the presiding circuit court judge shall evaluate the needs of the circuit, including the currency, congestion, and backlog of criminal and civil cases. <u>This assignment shall continue until revoked by the presiding judge or until the assigned judge leaves office, whichever comes first</u>."

(Emphasis added.) Thus, the amended version of Rule 13(A) removed the qualifier "temporarily" and added the emphasized language limiting the duration of the assignment until "revo[cation] by the presiding judge or until the assigned judge leaves office, whichever comes first."

Under § 12-9A-8 and Rule 13(A), Judge Elliott's Standing Order validly assigned District Judge Waters to serve as a circuit judge in the Morgan Circuit Court. Thus, when Judge Howell entered the September 2022 order assigning the <u>case</u>, Judge Waters was already authorized to act as a circuit judge. Judge Howell did not purport to (and did not need to) appoint Judge Waters as a special circuit judge under § 12-1-14.1—the Standing Order, in compliance with Rule 13A, had assigned District

---

Ala. R. Jud. Admin. That is not the situation here—the Standing Order applied to Judge Waters and had an expiration date.

15

Judge Waters to serve as a circuit judge.[7] Thus, § 12-1-14.1 does not apply

_____

[7]One of the dissenting opinions asserts that we are holding that Rule 13, Ala. R. Jud. Admin., "takes precedence over the enacted statutory law that sets a specific period for a special appointment." ___ So. 3d at ___ (Kellum, J., dissenting).  Not so.

Presumably, that dissenting opinion is referring to § 12-1-14.1, Ala. Code 1975, because § 12-9A-8, Ala. Code 1975, as noted, has no stated time limit for an assignment.  We are not holding that Rule 13 takes precedence over § 12-1-14.1; we are holding that § 12-1-14.1 does not apply here.

That dissenting opinion cites several decisions in support of its assertion that a statute must prevail over a court rule. But those decisions predate the adoption of Amendment No. 328 to the Alabama Constitution of 1901, which granted the Alabama Supreme broad rule-making authority over "the administration of all courts and rules governing practice and procedure in all courts." See Art. IV, § 150, Ala. Const. 2022. The legislature recognized that authority in § 12-1-1, Ala. Code 1975:  "Any provisions of this title regulating procedure shall apply only if the procedure is not governed by the Alabama Rules of Civil Procedure, the Alabama Rules of Appellate Procedure or any other rule of practice and procedure as may be adopted by the Supreme Court of Alabama." See, e.g., Stewart v. State, 730 So. 2d 1203, 1215-16 (Ala. Crim. App. 1996) (recognizing that "procedural rules promulgated by the Alabama Supreme Court generally govern over statutory provisions" but that the legislature "retains the authority to change those rules by a 'general act of statewide application'" (quoting § 6.11 of Amend. No. 328, Ala. Const. of 1901(now Art. IV, § 150, Ala. Const. 2022))).

Rule 13 imposes a time limit not expressed in § 12-9A-8. Rule 13(A) limits the duration of the assignment until "revo[cation] by the presiding judge or until the assigned judge leaves office, whichever comes first." This limit, however, is not in conflict with § 12-9A-8. Rather, the limit in Rule 13(A) makes explicit two common-sense assumptions in § 12-9A-8. First, if a presiding judge has power to assign a judge under § 12-9A-8,

16

to the September 2022 order, which dealt solely with the reassignment of a case between circuit judges in the same circuit court. And because the Standing Order was a valid assignment of Judge Waters to act as a circuit judge, Ex parte K.R., 210 So. 3d 1106 (Ala. 2016), and Bush v. State, 171 So. 3d 679 (Ala. Crim. App. 2014), are distinguishable.

Judge Howell's September 2022 order assigning the case to Judge Waters does not implicate the subject-matter jurisdiction of the circuit court. As the Alabama Supreme Court recently stated:

> "Subject-matter jurisdiction, generally, and the jurisdiction of a circuit court in a felony criminal prosecution, specifically, have been defined as follows:
>
> > "'Jurisdiction is "[a] court's power to decide a case or issue a decree." Black's Law Dictionary 867 (8th ed. 2004). Subject-matter jurisdiction concerns a court's power to decide certain types of cases. Woolf v. McGaugh, 175 Ala. 299, 303, 57 So. 754, 755 (1911) ("'By jurisdiction over the subject-matter is meant the nature of the cause of action and of the relief sought."' (quoting Cooper v. Reynolds, 77 U.S. (10 Wall.) 308, 316, 19 L. Ed. 931 (1870))). That power is derived from the Alabama Constitution and the Alabama Code. See United States v. Cotton, 535 U.S. 625, 630-31, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002) (subject-matter

_____

the presiding judge has power to end that assignment. Second, § 12-9A-8 applies only to judges who are in office. Thus, if a judge leaves office, any assignment of that judge under § 12-9A-8 ends when the judge leaves office.

jurisdiction refers to a court's "statutory or constitutional power" to adjudicate a case). In deciding whether [a] claim properly challenges the trial court's subject-matter jurisdiction, we ask only whether the trial court had the constitutional and statutory authority to try the offense with which [the defendant] was charged and as to which he has filed his petition for certiorari review.

"'Under the Alabama Constitution, a circuit court "shall exercise general jurisdiction in all cases except as may be otherwise provided by law." Amend. No. 328, § 6.04(b), Ala. Const. 1901 [(now Ala. Const. 2022, art. VI, § 142(b))]. The Alabama Code provides that "[t]he circuit court shall have exclusive original jurisdiction of all felony prosecutions ...." § 12-11-30, Ala. Code 1975.'

"Ex parte Seymour, 946 So. 2d 536, 538 (Ala. 2006).

"It has been further noted that '[s]ubject-matter jurisdiction generally lies with a court ... and not with a specific judge sitting on that court.' Ex parte Montgomery, 79 So. 3d 660, 668 n.4 (Ala. Civ. App. 2011) (rejecting an argument that a circuit judge's orders were void for lack of subject-matter jurisdiction because the judge had not been formally assigned to that case). Moreover, this Court has held that the assignment of a judge under Rule 13[, Ala. R. Jud. Admin.,] does not impact the jurisdiction of the court:

"'Rule 13 of the Rules of Judicial Administration authorizes a presiding circuit judge to temporarily assign a circuit or district judge to serve in either a circuit or a district court within the circuit. The rule finds its sanction in the Constitution.

"'[Amendment No. 328, § 6.11, Ala. Const.

18

1901 (now Ala. Const. 2022, art. VI, § 150),] mandated that this court "... make and promulgate rules governing the administration of all courts ...." The only limitation upon those rules is that they "... shall not abridge, enlarge or modify the substantive right of any party nor affect the jurisdiction of circuit and district courts ...." or venue, or jury trial. The assignment by the Presiding Judge of the Circuit Court of Mobile County of District Judge Sweeney to preside over a felony trial is not offensive to any of these limitations. <u>The jurisdiction of neither the Circuit nor the District Court of Mobile County is affected by the temporary assignment of a judge from one to the other. The jurisdiction of both courts remains the same</u>, as does the venue of causes in either. The substantive right of no party has been affected by the temporary assignments of Judge Sweeney.'

"<u>State ex rel. Locke v. Sweeney</u>, 349 So. 2d 1147, 1148 (Ala. 1977) (emphasis added)."

<u>Ex parte Files</u>, 413 So. 3d 679, 682 (Ala. 2024) (first emphasis added).

Based on those principles, the Alabama Supreme Court held: "In this case, it is undisputed that Files was charged and convicted of a felony, specifically, murder. The Walker Circuit Court thus had subject-matter jurisdiction over the prosecution of that offense." <u>Id.</u> at 682-83.

Because the Standing Order assigned Judge Waters as a circuit judge, arguably no formal assignment was necessary when Osborn's case was assigned to Judge Waters in September 2022. In any event, when

Judge Waters began presiding over Osborn's case in September 2022, the Morgan Circuit Court had jurisdiction over Osborn's case, and District Judge Waters had been assigned by the presiding circuit judge to act as a circuit judge in that circuit.

We recognize, however, the problem on the materials before us: Judge Waters's assignment to act as a circuit judge under the Standing Order expired January 4, 2023, more than a month before Osborn's trial started on February 6, 2023.[8] Although we question whether Osborn needed to first challenge the assignment of Judge Waters in the circuit court, we need not decide that issue because Judge Waters was a de facto officer under § 36-1-2, Ala. Code 1975, which provides:

> "The official acts of any person in possession of a public office and exercising the functions thereof shall be valid and binding as official acts in regard to all persons interested or affected thereby, whether such person is lawfully entitled to hold office or not and whether such person is lawfully qualified or not, but such person shall be liable to all penalties imposed by law for usurping or unlawfully holding office or for exercising the functions thereof without lawful right or

---

[8]Because Osborn waited until this appeal to challenge Judge Waters's authority, the record was underdeveloped on this issue. Although we question the practicality of every appellate record including a full history of the judge's qualifications—especially when no one questions those qualifications in the trial court—the better practice is to include all such assignment orders in the record, particularly in a case of this magnitude.

without being qualified according to law."

The Court of Civil Appeals discussed the de facto officer doctrine in Dean v. Dean, 295 So. 3d 82 (Ala. Civ. App. 2019). In Dean, a retired circuit judge entered an order after the expiration of his appointment by the Chief Justice as a temporary circuit judge. The Court of Civil Appeals applied the de facto officer doctrine and held that the order was valid. The court explained:

> "Alabama law has long recognized the principle that actions taken by persons who have incorrectly claimed the right to act in the capacity of a public official of this state are, in certain instances, valid in spite of those persons' lack of legal authority to so act. The concept of a 'de facto officer' was discussed at some length by our supreme court in Cary v. State, 76 Ala. 78 (1884), in which a question arose concerning the authority of a person named Frank Nabors, who signed an arrest warrant several months after the expiration of his appointment as a notary public. After noting that Nabors could not have acted as an officer de jure in signing the warrant, our supreme court proceeded to the resulting question:
>
>> " 'The rule is well settled, that the official acts of an officer de facto are just as valid, for all purposes, as those of an officer de jure, so far as the public and third persons are concerned. Joseph v. Cawthorn, 74 Ala. 411 [(1883)], and cases cited. As observed by Sutherland, J., in Wilcox v. Smith, 5 Wend. 231[, 233 (N.Y. Sup. Ct. 1830)], "the affairs of society could not be carried on upon any other principle."

21

"'It is sometimes very difficult to determine whether one claiming to exercise the duties of an office, is an officer de facto, or a mere usurper. The distinction is sometimes said to be, that the former claims to hold under color of election or appointment, while the latter claims no authority or color of authority for his intrusion into possession of the office whose functions he undertakes to usurp ... The better and more modern view, however, is, that no color of election or appointment is needed to constitute one an officer <u>de facto</u>. While it is sufficient for such purpose, it is not a necessary pre-requisite ....

"'To constitute Nabors a <u>de facto</u> notary, ... he must either have acted under color of appointment and claim of official right, <u>or he must have continued to exercise the duties of his office, by public acquiescence, for such length of time and by such frequency of repetition as to afford reasonable presumption of his holding over under a re-appointment</u>. The first commission having expired, without any right in law to hold over, it could not, in our judgment, lend color for any length of time beyond its expiration.

"'... [A]lthough an expired commission is not color of title to office, still, <u>if an elected or appointed public officer continues, without break, and without question by the public, to exercise the functions of the office after the expiration of his commission, this is a continued exercise of the duties of the office by acquiescence</u>, and, under the modern rule, constitutes the person thus acting an officer de facto ....

"'It is manifest, moreover, that an appointment may often be presumed upon

22

evidence which would fail to justify presumption of a popular election, because it is an investiture of office less public in its nature, and the whole doctrine imparting validity to the unauthorized acts of de facto officers is one based on justice, necessity and public policy, and is intended chiefly for the protection of an innocent public who may be ignorant of the officer's defect of official title. – – Joseph v. Cawthorn, 74 Ala. 411[, 415 (1883)].'

"Cary, 76 Ala. at 84-86 (emphasis added). Our legislature subsequently codified the de facto officer doctrine that was applied in Cary. See Ala. Code 1975, § 36-1-2.

"The de facto officer doctrine was more recently applied by our supreme court in [State v. Gwin, 808 So. 2d 65 (Ala. 2001) ('Gwin II'),] to the judicial acts of a circuit judge who had been appointed by our supreme court to serve as a circuit judge in a particular county, yet was not qualified to serve at the time he rendered a judgment against a motorist who had pleaded guilty to a charge of reckless driving. Reviewing the judgment of reversal of the Court of Criminal Appeals in [Gwin v. State, 808 So. 2d 64 (Ala. Crim. App. 2000) ('Gwin I'),] our supreme court acknowledged the legal requirement upon which the Court of Criminal Appeals had relied: that a circuit judge be a resident of the circuit to whose bench that judge has been appointed for at least 12 months. However, our supreme court nonetheless declined to hold that that 'irregularity,' i.e., the claimed violation of the residency requirement, warranted declaring the judgment against the motorist invalid:

"'Despite this irregularity, [the motorist] did not object to [the special circuit judge]'s appointment before the judgment of conviction and sentence was entered. [The special circuit judge], who was holding the office of circuit judge and was exercising the functions thereof, was a de facto

23

officer when he accepted [the motorist]'s plea. "'A de facto officer is one who exercises the duties of a de jure office under color of appointment or election ....'" <u>Dixie Dairies v. Alabama State Milk Control Bd.</u>, 286 Ala. 198, 202, 238 So. 2d 551, 554 (1970) (quoting <u>Ex parte Register</u>, 257 Ala. 408, 413, 60 So. 2d 41, 46 (1952)). Section 36-1-2, Ala. Code 1975, which protects the actions of <u>de facto</u> officers, reads:

"'"The official acts of any person in possession of a public office and exercising the functions thereof shall be valid and binding as official acts in regard to all persons interested or affected thereby, whether such person is lawfully entitled to hold office or not and whether such person is <u>lawfully qualified or not</u> ...."

"'(Emphasis added.) The judgment [the motorist] appealed from is valid and remains intact as an action of a <u>de facto</u> officer protected by statute.'

"<u>Gwin II</u>, 808 So. 2d at 67. <u>Accord</u> <u>Benjamin v. State</u>, 156 So. 3d 424, 459-60 (Ala. Crim. App. 2013) (postconviction claim asserting that retired judge who had sentenced criminal defendant to death had exceeded limits of 'temporary' active service was properly dismissed based upon de facto officer doctrine; defendant failed to object to judge's service until after trial and sentencing).

"In this case, the retired circuit judge's actions during the 'assignment gap' fall within the parameters of the <u>de facto</u> officer doctrine so as to warrant our rejection of the former husband's voidness argument. The order entered by the retired circuit judge on March 10, 2019, in response to the former husband's two motions filed after the entry of the

24

judgment under review, notes that the retired circuit judge 'has been regularly presiding over domestic cases in this circuit' and that, during the 'assignment gap,' he 'presided over twelve separate long-established court dockets,' entered 'more than eight hundred orders,' and entered 'more than forty final judgments.' That activity, in our view, amply warrants classification of the acts of the retired circuit judge during the 'assignment gap' as those of a de facto circuit judge under Cary: he is an 'appointed public officer [who] continue[d], without break, and without question by the public, to exercise the functions of the office [of circuit judge] after the expiration of his commission.' 76 Ala. at 86. The former husband did not raise any objection to the assignment of the modification and enforcement claims to the retired circuit judge in May 2018, when they were first transferred to him for disposition, nor at any other time before the entry of the January 31, 2019, judgment. Thus, under Gwin II (and notwithstanding Paulk [v. Paulk, 249 So. 3d 521 (Ala. Civ. App. 2017)[9]]), the former husband may not properly be heard to complain here and now about the judicial authority of the retired circuit judge.

"The former husband next attacks, on a number of fronts, the chief justice's February 5, 2019, third assignment order directed to the retired circuit judge. Several of the

---

[9]In Paulk v. Paulk, 249 So. 3d 521 (Ala. Civ. App. 2017), a retired circuit judge entered an order after the case was remanded by the Court of Civil Appeals. The mother appealed that judgment, and the Court of Civil Appeals ex mero motu held that the retired judge had no authority because the record did not show that he had been appointed as a temporary circuit judge. Two years later in Dean the Court of Civil Appeals noted that neither party in Paulk had "offered any legal basis upon which it could be concluded that a retired judge could enter an order outside the scope of a valid appointment." Dean, 295 So. 3d at 87. In other words, no one in Paulk raised the de facto officer doctrine, and the Court of Civil Appeals apparently did not consider it. We thus question the continuing validity of the Paulk decision.

25

objections lodged by the former husband—for example, the retired circuit judge's residency outside the circuit encompassing Shelby County and his purportedly having reached the age of 70 years—pertain to requirements that a candidate for <u>election</u> to the circuit bench would be required to meet; the former husband additionally contends that the retired circuit judge's repetitive appointments by successive chief justices for more than 180 days at a time are not legally authorized. The former husband appears to assert that the sole source of the chief justice's assignment power is that set forth in Ala. Code 1975, § 12-1-14, which provides that our supreme court 'may appoint and commission special circuit judges ... for temporary service[ ] provided ... that the person so appointed shall possess the qualifications for the judgeship to which [the person] is appointed' .... However, our supreme court rejected in <u>Gwin II</u> the proposition advanced by the former husband here, noting that § 12-1-14 'requires that a commission be issued to the appointee and that the appointee take an oath of office' and '<u>does not</u> govern a person who, before the appointment, <u>occupies the office of judge</u>, because that person will have already fulfilled these requirements when he or she initially assumed the judgeship.' 808 So. 2d at 66-67 (emphasis added).

"In deeming the retired circuit judge in this case to similarly 'occup[y] the office of judge' at the time of the chief justices' assignment orders, we note the applicability in this case of Ala. Code 1975, § 12-18-7(b), which provides that a 'retiring justice or judge, upon being retired, shall take the oath of office as a retired justice or judge <u>and thereupon become an extra or additional judge of the state</u>,' and that '[t]hereafter, on the request of the Chief Justice, ... any such retired justice or judge may serve on ... <u>any circuit court</u> in the state' (emphasis added). <u>Accord</u> Ala. Const. 1901 (Off. Recomp.), Art. VI § 149 (retired judges may be assigned by chief justice to perform 'temporary service in any court'). Further, although a <u>presiding circuit judge's</u> authority to appoint and commission a special circuit-court judge for

26

> 'temporary service' is limited to periods of 180 consecutive days in each instance, <u>see</u> Ala. Code 1975, § 12-1-14.1(b), we find no such temporal limitation upon the authority of the chief justice to assign a retired circuit judge in § 12-18-7 or in § 149. <u>See also</u> <u>Benjamin</u>, 156 So. 3d at 458-59 (opining that § 12-1-14.1(b) does not apply to judicial appointments or assignments not undertaken under the auspices of that statute). We therefore conclude that the former husband has failed to demonstrate that the chief justice acted outside the discretion of that office on February 5, 2019, in assigning the retired circuit judge to the circuit encompassing Shelby County for the remainder of this year."

295 So. 3d at 87-90.

Osborn argues that the de facto officer doctrine applies only to what he describes as "technical" defects, not jurisdictional ones. He asserts that <u>Dean</u>, <u>supra</u>, <u>State v. Gwin</u>, 808 So. 2d 65 (Ala. 2001) ("<u>Gwin II</u>"), and <u>Benjamin v. State</u>, 156 So. 3d 424 (Ala. Crim. App. 2013), all involved "technical defects"—the judge in <u>Gwin II</u> was a special judge from a different county who did not meet the residency requirement; the judge in <u>Dean</u> issued decisions between the end of his second special-appointment term and the beginning of a third term; and the judge in <u>Benjamin</u> had been appointed to year-long terms instead of the statutory maximum of six months. The common denominator in these cases, says Osborn, is that "these judges had been appointed by someone with authority to issue judicial commissions in the first place"—the Alabama

27

Supreme Court in <u>Gwin II</u> and the Chief Justice in <u>Benjamin</u> and in <u>Dean</u>.

Under that standard, however, as we have shown, the Standing Order assigning Judge Waters as a circuit judge was made by the person statutorily authorized to issue it—the then-presiding circuit judge. And the expiration of that assignment occurred not by statute but under the Standing Order, just as the appointment orders in <u>Dean</u> and <u>Benjamin</u> expired under the respective terms of the appointment orders at issue.

In support of his assertion that the de facto officer doctrine applies to technical but not jurisdictional defects, Osborn also cites <u>Wrenn v. District of Columbia</u>, 808 F.3d 81, 84 (D.C. Cir. 2015). In <u>Wrenn</u>, the judge at issue—District Judge Scullin of the Northern District of New York—decided a case in another district, the District Court for the District of Columbia ("D.C."). The Chief Justice of the United States had, under the applicable statute, designated and assigned Judge Scullin to hear certain cases in the D.C. District Court—but not in the case at issue. The D.C. Circuit cited <u>Frad v. Kelly</u>, 302 U.S. 312 (1937), in which a district judge had decided a new case after his authorized time as a visiting judge expired. In <u>Frad</u>, the "temporal limitation" of the

28

appointment to sit as a visiting judge was described as <u>jurisdictional</u> and thus prevented application of the de facto officer doctrine. The <u>Wrenn</u> court explained:

> "Like the designated judge in <u>Frad</u>, Judge Scullin had a limited designation that did not extend beyond the specifications of that designation. In <u>Frad</u>, the breached limitation was temporal; in this case, it is case designation. In either case, a judge acting beyond his designation acts without jurisdiction."

808 F.3d at 84.

The description of a "temporal limitation" as jurisdictional in <u>Frad</u> is at odds with <u>Dean</u> and <u>Benjamin</u>, which involved temporal or time-based problems—that is, the judges in <u>Dean</u> and <u>Benjamin</u> served <u>after</u> the expiration of their appointments, which is what happened in <u>Frad</u> and prevented application of the de facto officer doctrine in <u>Frad</u>. And the problem here is that Judge Waters appears to have continued to serve after the expiration of her assignment.

This points to a possible distinction between the federal de facto officer doctrine—which, as far as we can tell, is an equitable doctrine based in the common law—and the Alabama doctrine codified at § 36-1-2. <u>Cf</u>. <u>Ryder v. United States</u>, 515 U.S. 177, 180-81 (1995) ("The de facto officer doctrine confers validity upon acts performed by a person acting

29

under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient. … The doctrine has been relied upon by this Court in several cases involving challenges by criminal defendants to the authority of a judge who participated in some part of the proceedings leading to their conviction and sentence."). Regardless, decisions of federal courts other than the United States Supreme Court are not controlling. See, e.g., Glass v. Birmingham S. R.R., 905 So. 2d 789, 794 (Ala. 2004) ("[I]n determining federal common law, we defer only to the holdings of the United States Supreme Court and our own interpretations of federal law. Legal principles and holdings from inferior federal courts have no controlling effect here, although they can serve as persuasive authority."). The fundamental problem with Osborn's arguments is they simply do not address the plain language of § 36-1-2, which does not distinguish between technical or jurisdictional defects. Rather, § 36-1-2 turns on "[t]he official acts of any person in possession of a public office and exercising the functions thereof."

Osborn also asserts that no Alabama appellate courts have "applied the de facto officer doctrine to affirm the decisions of a special judge who

was not appointed by someone with the authority to do so." (Osborn's reply brief, p. 9.) Of course, we have held that Presiding Judge Elliott had the authority to assign Judge Waters to sit as a circuit judge. But, even assuming that assignment expired, Osborn's argument is unavailing.

Before the de facto officer doctrine was codified, the Alabama Supreme Court more than a century ago held that the propriety of the appointing authority is not the decisive issue. In Cary v. State, 76 Ala. 78 (1884), which is quoted in Dean, the Alabama Supreme Court held that the doctrine applies to one who occupies an office and exercises its functions:

> "It is sometimes very difficult to determine whether one claiming to exercise the duties of an office, is an officer de facto, or a mere usurper. The distinction is sometimes said to be, that the former claims to hold under color of election or appointment, while the latter claims no authority or color of authority for his intrusion into possession of the office whose functions he undertakes to usurp.—People v. Staton (73 N.C. 546), 21 Amer. Rep. 479 [(1875)]. The better and more modern view, however, is, that no color of election or appointment is needed to constitute one an officer de facto. While it is sufficient for such purpose, it is not a necessary pre-requisite. The true principle is, that there must be either some color of election or appointment, or else 'an exercise of the office, and an acquiescence on the part of the public, for a length of time which would afford a strong presumption of at least a colorable election or appointment.'—Wilcox v. Smith (5 Wend. 231), 21 Amer. Dec. 213 [(1830)]; State v. Carroll (38 Conn. 449), 9 Amer. Rep. 409, 425 [(1871)]. Or, as we find the rule

stated elsewhere, 'the mere exercise of the functions of an office will not be sufficient to make a person a de facto officer, where there is no claim to the office under color of an election or an appointment, unless the exercise thereof has been open, notorious, and continued for such a length of time, without the public having interfered, as to justify the presumption that the party was duly appointed.' <u>Hildreth v. McIntire</u>, 19 Amer. Dec. 61 [(1829)], and NOTE on p. 68. In <u>Rex v. Bedford Level</u>, 6 East, 356, Lord Ellenborough defined an officer de facto as 'one who has the reputation of being the officer he assumes to be, and yet is not a good officer in point of law,' thus adopting the definition of Lord Holt in <u>Parker v. Kett</u>, 12 Mod. 467, which was decided as far back as the year 1693. The definition is one now fully recognized in England, and has been generally adopted by the American courts in its broadest and most liberal sense.—<u>Wilcox v. Smith</u>, 21 Amer. Dec. 213; <u>Hildreth v. McIntire</u>, 19 Amer. Dec. p. 63, NOTE; <u>State v. Carroll</u>, 9 Amer. Rep. 409."

76 Ala. at 85.

Finally, Osborn's technical/jurisdictional theory of the de facto officer doctrine is at odds with <u>Roberts v. Bright</u>, 222 Ala. 677, 133 So. 907 (1931), in which the trustees of a school district were challenged as not having been elected as trustees as required by law. The Alabama Supreme Court rejected this challenge under the de facto officer doctrine as codified in a predecessor to § 36-1-2:

"[T]he pleas show that the therein named trustees were <u>in possession of</u> such office of trustee of said school <u>and exercising the functions thereof</u>, being at least what may be termed de facto trustees. The averments of the plea constitute but a collateral attack upon their title to such an office, which

32

cannot be done in this proceeding."

222 Ala. at 679, 133 So. at 909 (emphasis added). Here, Judge Waters was "in possession of" the office of circuit judge for Osborn's case and "exercised the functions thereof." Judge Waters completed the trial and sentencing without objection until this appeal. Under § 36-1-2, Judge Waters was a de facto officer, and Osborn is due no relief.

II.    The prosecutor's statement during closing argument that "there's only two people that know what happened out there and one of them is dead" was a direct comment on Osborn's decision not to testify and, with no curative instruction, was plain error.

During closing arguments in the guilt phase, the prosecution stated in its rebuttal argument:

> "Circumstantial evidence, we told you at the beginning of the case, circumstantial evidence is perfectly good evidence, this is a case that largely rests on circumstantial evidence We don't have an eye witness. Now, there's really two people, I suppose possibly three, but there's only two people that know what happened out there and one of them is dead. If you think about it, lots and lots of crimes are created that way. If the principal witness is dead, you're not going to have any direct evidence."

(R. 960.) Although Osborn did not object to these comments at trial, he argues on appeal that the prosecutor's argument was a direct comment on his decision not to testify and that the circuit court's failure to take prompt curative action was plain error. In response, the State argues

that, placed in context, "no juror would naturally and necessarily take the statement at issue to be a comment on Osborn's failure to testify. … Instead, the statement would have been taken for what it was: a part of a broader argument regarding the validity of circumstantial evidence, made as a rebuttal to Osborn's closing argument that stressed the invalidity of the same." (State's brief, p. 51.)

Osborn relies principally on <u>Powell v. State</u>, 631 So. 2d 289 (Ala. Crim. App. 1993), in which this Court held that these statements by the prosecutor during closing argument constituted plain error:

> "'Another couple of questions that y'all were asked about [during voir dire examination] has to do with direct and circumstantial evidence. Y'all probably have gathered through listening to several days of testimony in this case that there were two people involved in the commission of this crime. The victim Esther Herchenroeder is dead. She cannot come in and testify.

> "'The second person involved is the defendant Timothy Powell. There are no eyewitnesses to this crime. There were two people involved. So what do you have to look at if you don't have eyewitness testimony? You have got to go on circumstantial evidence.'"

631 So. 2d at 291. This Court held:

> "By asking the jury, 'So what do you have to look at if you don't have eyewitness testimony? You have got to go on circumstantial evidence,' R. 1977, the prosecutor called the jury's attention to the fact that the appellant, the only

34

eyewitness who <u>could</u> have taken the stand, did not testify.

> "We cannot escape the conclusion that the prosecutor's statement 'was manifestly intended to be, or was of such a character that the jury would naturally and necessarily take it to be, a comment on the failure of the accused to testify.' <u>Ex parte Wilson</u>, 571 So. 2d [1251,] 1261 [(Ala. 1990)] (quoting <u>Marsden v. Moore</u>, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S. Ct. 534, 102 L.Ed.2d 566 (1988))."

631 So. 2d at 291-92. The statements in Osborn's case are almost identical to those in <u>Powell</u>.

A plurality of this Court recently found plain error under similar circumstances in <u>Sykes v. State</u>, [Ms. CR-2022-0546, May 3, 2024] ___ So. 3d ___ (Ala. Crim. App. 2024), <u>writ quashed</u>, No. SC-2024-0395, Sept. 12, 2025. This Court stated:

> "In all criminal prosecutions, the accused shall not be compelled to give evidence against himself. Alabama Constitution, Art. I, § 6. The right against self-incrimination is likewise enshrined in the Alabama Code:
>
>> "'On the trial of all indictments, complaints or other criminal proceedings, the person on trial shall, at his own request, but not otherwise, be a competent witness, and his failure to make such a request shall not create any presumption against him nor be the subject of comment by counsel. If the district attorney makes any comment concerning the defendant's failure to testify, a new trial must be granted on motion filed within 30 days from entry of the judgment.'

35

"§ 12-21-220, Ala. Code 1975.'"[O]nce a defendant chooses not to testify at his trial the exercise of that choice is not subject to comment by the prosecution."' Ex parte Davis, 718 So. 2d 1166, 1173 (Ala. 1998) (quoting Wherry v. State, 402 So. 2d 1130, 1133 (Ala. Crim. App. 1981)).

"'Comments by a prosecutor on a defendant's failure to testify are highly prejudicial and harmful, and courts must carefully guard against a violation of a defendant's constitutional right not to testify. Whitt [v. State, 370 So. 2d 736, 739 (Ala. 1979)]; Ex parte Williams, 461 So. 2d 852, 853 (Ala. 1984); see Ex parte Purser, 607 So. 2d 301 (Ala. 1992). This Court has held that comments by a prosecutor that a jury may possibly take as a reference to the defendant's failure to testify violate Art. I, § 6, of the Alabama Constitution of 1901. Ex parte Land, 678 So. 2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S. Ct. 308, 136 L. Ed. 2d 224 (1996); Ex parte McWilliams, 640 So. 2d 1015 (Ala. 1993); Ex parte Wilson, [571 So. 2d 1251, 1261 (Ala. 1990)]; Ex parte Tucker, 454 So. 2d 552 (Ala. 1984); Beecher v. State, 294 Ala. 674, 320 So. 2d 727 (1975). Additionally, the Fifth and Fourteenth Amendments of the United States Constitution may be violated if the prosecutor comments upon the accused's silence. Griffin v. California, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965); Ex parte Land, supra; Ex parte Wilson, supra. Under federal law, a comment is improper if it was "'"manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."'" United States v. Herring, 955 F.2d 703, 709 (11th Cir.), cert. denied, 506 U.S. 927, 113 S. Ct. 353, 121 L. Ed. 2d 267 (1992) (citations omitted); Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488

36

U.S. 983, 109 S. Ct. 534, 102 L. Ed. 2d 566 (1988); United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S. Ct. 440, 83 L. Ed. 2d 365 (1984). The federal courts characterize comments as either direct or indirect, and, in either case, hold that an improper comment may not always mandate reversal.

"'Consistent with this reasoning, Alabama law distinguishes direct comments from indirect comments and establishes that a direct comment on the defendant's failure to testify mandates the reversal of the defendant's conviction, if the trial court failed to promptly cure that comment. Whitt v. State, supra; Ex parte Yarber, [375 So. 2d 1231, 1233 (Ala. 1979)]; Ex parte Williams, supra; Ex parte Wilson, supra. On the other hand, "covert," or indirect, comments are construed against the defendant, based upon the literal construction of Ala. Code 1975, § 12-21-220, which created the "virtual identification doctrine." Ex parte Yarber, 375 So. 2d at 1234. Thus, in a case in which there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error, there must have been a virtual identification of the defendant as the person who did not become a witness. Ex parte Yarber, 375 So. 2d at 1234; Ex parte Williams, supra; Ex parte Wilson, supra; Ex parte Purser, supra.'

"Ex parte Brooks, 695 So. 2d 184, 188-89 (Ala. 1997) (footnote omitted).

"Our decision here is controlled by the opinions of the Alabama Supreme Court in Whitt v. State, 370 So. 2d 736 (Ala. 1979), and Ex parte Wilson, 571 So. 2d 1251 (Ala. 1990). In Whitt, the defendant had been indicted for first-degree

37

murder arising out of a fatality in an automobile collision. The defendant was ultimately convicted of second-degree murder and was sentenced to 25 years in prison. This Court affirmed the defendant's conviction and sentence. The Alabama Supreme Court granted the defendant's petition for a writ of certiorari to consider whether the prosecutor had made an impermissible comment on the defendant's failure to testify.

"The defendant in Whitt neither testified nor called any witnesses on his behalf. During closing arguments, the prosecutor remarked: 'The only person alive today that knows what happened out there that night is sitting right there.' Defense counsel objected to the comment and moved for a mistrial on the ground that the prosecutor had commented on the defendant's failure to testify.

"The trial court denied the defendant's motion and instructed the jury: 'I am going to instruct the jury though to disregard the last remark in regard to that. The statement made by the District Attorney in his argument is only his inferences from the evidence, but I want you to disregard the last remark, just what he said.' Whitt, 370 So. 2d at 737.

"This Court held that the remark 'was "argument in kind" to rebut remarks by petitioner's counsel, that it was only an "indirect" reference to petitioner's failure to testify, and, finally, that any possible reference to petitioner was "eradicated" by the court's instructions.' Whitt, 370 So. 2d at 738. The Supreme Court rejected each holding.

"'We must disagree and hold that the remark was not an "argument in kind," was not an "indirect" reference to the petitioner's failure to testify, and was not "eradicated" by the court's instructions.

"'The comment "The only person alive today that knows what happened out there that night is sitting right there" is almost identical to the

38

comment "'No one took the stand to deny it'" held to be a <u>direct</u> comment on the defendant's failure to testify and held to be <u>reversible</u> error in <u>Beecher [v. State]</u>, 294 Ala. 674, 320 So. 2d 727 (1975) (per Justice Embry). The comment is very close to the comment made in <u>Warren v. State</u>, 292 Ala. 71, 288 So. 2d 826 (1973). There, this Court held (per Justice McCall) that the argument "'The only one that said he didn't sell it (marijuana) was the little brother'" was also a <u>direct</u> comment on the failure of the defendant to testify and constituted <u>reversible</u> error. It is thus that we must conclude, based on the holding and rationale of those two cases, that the comment by the district attorney in this case was a <u>direct</u> comment on the failure of the defendant to testify and constituted <u>error</u> to reverse.

"'We cannot agree with the Court of Criminal Appeals that this comment was "argument in kind" to rebut remarks made by petitioner's counsel. It seems self-evident that it cannot be "argument in kind" when we do not have the defense counsel's argument to which this comment is said to reply. The record does not contain the closing arguments in this case.

"'....

"'This brings us to a consideration of the last ground given by the Court of Criminal Appeals for finding that the second comment did not constitute reversible error, namely, whether the trial court's instructions to the jury cured such impermissible comment.

"'We cannot agree that the trial court's instructions in this case were sufficient to cure the

39

harmful effect of the district attorney's comment. The court stated:

> """I am going to instruct the jury though to disregard the last remark in regard to that. The statement made by the District Attorney in his argument is only his inferences from the evidence, but I want you to disregard the last remark, just what he said. I will deny your motion."
>
> "'In seeking to instruct the jury to disregard the remark, we think that the trial court's instructions fell short of what is required to effectively erase the highly prejudicial and harmful nature of such a comment.
>
> "'....
>
> "'We suggest that, at a minimum, the trial judge must sustain the objection, and should then promptly and vigorously give appropriate instructions to the jury. Such instructions should include that such remarks are improper and to disregard them; that statements of counsel are not evidence; that under the law the defendant has the privilege to testify in his own behalf or not; that he cannot be compelled to testify against himself; and, that no presumption of guilt or inference of any kind should be drawn from his failure to testify. With appropriate instructions, we hold that the error of the prosecutor's remarks will be sufficiently vitiated so that such error is harmless beyond a reasonable doubt. U.S. v. Brown, 546 F.2d 166 (5th Cir. 1977); Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); Beecher v. State, supra.'

"370 So. 2d at 738.

"The Alabama Supreme Court was confronted with a similar remark by the prosecutor in Ex parte Wilson, supra. In Wilson, the defendant had been convicted of three counts of capital murder and sentenced to death. Following this Court's affirmance of the defendant's convictions and sentence, the Alabama Supreme Court granted the defendant's petition for a writ of certiorari to consider, among other things, the propriety of the following argument made during the State's rebuttal in closing arguments: '"I can't tell you what that woman went through during that night, because there is only one eyewitness, and he ain't going to tell you. I wish I could tell you all of that. I can give you this evidence that these officers have worked meticulously to gather up ...."' Wilson, 571 So. 2d at 1259. The defendant moved for a mistrial, asserting that the argument was '"the equivalent of saying that this defendant has not testified."' Id. The State countered that the remark was a reasonable inference from the evidence, specifically, a taped confession given by the defendant. The trial court denied the defendant's motion for mistrial, and the prosecutor resumed his rebuttal: 'When I say that, I mean this defendant didn't tell you on that tape recording that he gave Alvin Kidd as to what she went through ....' Id. The trial court gave a lengthy instruction after closing arguments had concluded regarding a defendant's right not to testify.

"The State argued before the Alabama Supreme Court that the prosecutor's 'comment was not on the defendant's failure to testify, ... that his explanatory sentence "made it clear to the jury that he was referring to the defendant's sketchy incriminating statements, which had been admitted into evidence,"' and that the jury would not have reasonably understood the remark to be a comment on the defendant's failure to testify. Wilson, 571 So. 2d at 1260. The Court was unpersuaded. Relying heavily on Whitt, the Alabama

41

Supreme Court held the remark combined with the trial court's failure to promptly cure the remark to be reversible error:

> "'The statements in this case do not fall within the bounds set forth in Ex parte Dobard, [435 So. 2d 1351 (Ala. 1983)], or Beecher [v. State, 294 Ala. 674, 320 So. 2d 727 (1975)].[3] The district attorney clearly did not comment generally on the State's evidence standing uncontradicted. His statement falls well outside the permitted range available to a district attorney in closing and is far more prejudicial than those statements deemed to be indirect comments in Ex parte Williams, [461 So. 2d 852 (Ala. 1984)]. See also Stain v. State, 494 So. 2d 816 (Ala. Crim. App. 1986) (court unable to distinguish comment from that in Williams)....

> "'....

> "'We find here that the comment made by the district attorney was a direct comment on the defendant's failure to testify and violated the defendant's rights as found under the United States Constitution, the Constitution of Alabama of 1901, and Ala. Code (1975), § 12-21-220. We cannot agree that the comment made by the district attorney could have been understood by the jury only as a reference to the defendant's "sketchy incriminating statement."'

"Wilson, 571 So. 2d at 1263-65.

"The remark in the instant case—'There's only two people in the world that know what happened in that house. One of them's dead, and the other one is sitting right over there at the end of that table. (Indicating).'—closely parallels the remarks in Whitt and Wilson. The State asserts that,

42

when viewed in context, the challenged remark was merely a response to the argument of defense counsel during his closing argument that there were gaps in the State's evidence. This Court finds the State's purported justification unavailing. Here, the prosecutor asserted to the jury that there were only two people who knew what had happened to Keshia—Keshia, who was dead and unable to testify, and Sykes. The prosecutor's remark 'called the jury's attention to the fact that [Sykes], the only eyewitness who <u>could</u> have taken the stand, did not testify.' <u>Powell v. State</u>, 631 So. 2d 289, 291-92 (Ala. Crim. App. 1993).

"In light of the holdings of the Alabama Supreme Court in <u>Whitt</u> and <u>Wilson</u>, this Court holds that the remark was a direct comment on Sykes's decision not to testify. Further, because the circuit court failed to take prompt curative action, this Court must reverse Sykes's convictions and sentence of death. <u>See</u> <u>Ex parte Wilson</u>, 571 So. 2d at 1261 ('In a case where there has been a direct reference to a defendant's failure to testify and the trial court has not acted promptly to cure that comment, the conviction must be reversed.').

"_____

"[3]In those cases, the Alabama Supreme Court held that, '[w]here the State's evidence does stand uncontradicted, the prosecutor does have the right to point this out to the jury.' <u>Beecher</u>, 294 Ala. at 682, 320 So. 2d at 734."

<u>Sykes</u>, ___ So. 3d at ___.

Under <u>Sykes</u> and the authorities cited therein, this Court holds that the prosecution's remark was a direct comment on Osborn's decision not to testify. And because the circuit court took no curative action, we must reverse Osborn's conviction and death sentence. <u>Sykes</u>, <u>supra</u>.

43

## Conclusion

The judgment of the circuit court is reversed, and the cause is remanded for proceedings consistent with this opinion.

REVERSED AND REMANDED.

Windom, P.J., concurs; Cole, J., concurs in the result; McCool, Special Judge,* concurs in part and dissents in part, with opinion. Kellum, J., dissents, with opinion. Anderson, J., recuses himself.


*Justice J. Chris McCool of the Alabama Supreme Court was appointed to serve as a Special Judge in regard to this appeal.

McCOOL, Special Judge, concurring in part and dissenting in part.

I concur with the threshold holdings in Part I of the main opinion -- specifically, that Judge Waters's assignment was proper and that, even if her assignment expired before Jason Michael Osborn's trial, the de facto officer doctrine defeats Osborn's claim that the assignment was improper. I dissent from the analysis in Part II of the main opinion and the determination that the Mobile Circuit Court's judgment should be reversed. Specifically, I do not agree that, when viewed in context, the prosecutor's statement during closing argument that "there's only two people that know what happened out there and one of them is dead" was a direct comment on Osborn's decision not to testify or that the statement rose to the level of plain error. When viewed in context, the statement was simply part of the prosecutor's comments about circumstantial evidence, not about Osborn's failure to testify, and no juror would have taken it to be an unconstitutional comment on Osborn's failure to testify.

The Fifth Amendment to the United States Constitution provides, in part, that "no person … shall be compelled in any criminal case to be a witness against himself." In Griffin v. California, 380 U.S. 609, 615 (1965), the United States Supreme Court held that "the Fifth

Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." The Court reasoned that allowing such comments would amount to "a penalty imposed by courts for exercising a constitutional privilege" and would "cut[] down on the privilege by making its assertion costly." Id. at 614. Unlike in the present case, in Griffin the prosecutor made direct comments on the defendant's failure to testify, such as the defendant "has not seen fit to take the stand and deny or explain" the allegations and "[the victim] can't tell you her side of the story. The defendant won't." Id. at 611.

> Further, the Alabama Supreme Court has stated that
>
> "an indirect statement, one of such character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify, violates the defendant's constitutional rights. Marsden v. Moore, 847 F.2d 1536 (11th Cir.), cert. denied, 488 U.S. 983, 109 S. Ct. 534, 102 L. Ed. 2d 566 (1988). Also, such a statement violates the defendant's rights under the Alabama Constitution. Beecher v. State, 294 Ala. 674, 320 So. 2d 727 (1975)."

Ex parte Payne, 683 So. 2d 458, 464 (Ala. 1996) (emphasis added).

Additionally, "[w]hen an accused contends that a prosecutor has made improper comments during a closing argument, the statements at issue must be viewed in the context of the evidence presented in the case and the entire closing argument made to the jury -- both defense counsel's and the prosecutor's." Ex parte Musgrove, 638 So. 2d 1360, 1368 (Ala. 1993). "Further, a prosecutor has the right to fairly 'reply in kind' to statements made by defense counsel in the defense's closing argument." Id. at 1369. It is within this basic jurisprudential framework that I will analyze the statement in the present case.

## I. The Context

"A text, out of context, is a pretext." Vernon Johnson, The Bible Study Notebook 26 (2015). See also Powell v. State, [Ms. CR-20-0727, May 3, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024) (McCool, J., dissenting) ("It is a well-known principle of biblical exegesis that 'a text without a context is usually a pretext.'"). This fundamental principle of biblical interpretation applies almost exactly to the analysis of statements such as the one at issue in this case, wherein it is alleged that a prosecutor has made a comment on Osborn's failure to testify. In this

case, the context clearly contradicts such an allegation, and therefore we should not find any error, much less plain error.

In the present case, defense counsel, as he should, concentrated on deficiencies in the State's evidence in his closing argument. Specifically, defense counsel particularly focused on the State's lack of direct evidence. In reply to that focus by defense counsel, during its rebuttal closing argument, the prosecution stated:

> "Circumstantial evidence, we told you at the beginning of the case, circumstantial evidence is perfectly good evidence, this is a case that largely rests on circumstantial evidence. We don't have an eyewitness. Now, there's really two people, I suppose possibly three, but there's only two people that know what happened out there and one of them is dead. If you think about it, lots and lots of crimes are created that way. If the principal witness is dead, you're not going to have any direct evidence."

In context, the prosecutor was simply replying to defense counsel's argument about the State's lack of direct evidence and highlighting the truth about circumstantial evidence. The prosecutor was permissibly pointing out that, many times, the only eyewitnesses to a murder are the victim and the perpetrator and that, because the only eyewitnesses to the murder are the victim and the perpetrator, the State must rely on circumstantial evidence; however, circumstantial evidence alone is

48

enough to support a conviction and is not inferior to direct evidence. That explanation constitutes neither a direct nor an indirect unconstitutional comment on Osborn's failure to testify.

Moreover, contrary to the main opinion's assertion, the prosecutor did not make a direct comment on Osborn's failure to testify. The prosecutor did not expressly mention Osborn's not testifying. In fact, unlike in Powell v. State, 631 So. 2d 289 (Ala. Crim. App. 1993), which is the only precedential case relied on by the main opinion and is the primary case relied on by Osborn, the words "testimony," "testify," or any other similar words do not appear anywhere in the prosecutor's complained-of comments in the present case.[10] Further, nothing in the

_____

[10]As stated in the main opinion, in Powell this Court held that the following statements constituted plain error:

"'Another couple of questions that y'all were asked about [during voir dire examination] has to do with direct and circumstantial evidence. Y'all probably have gathered through listening to several days of testimony in this case that there were two people involved in the commission of this crime. The victim Esther Herchenroeder is dead. She cannot come in and testify.

"'The second person involved is the defendant Timothy Powell. There are no eyewitnesses to this crime. There were two people involved. So what do you have to look at if you don't

prosecutor's comments in the present case "necessarily" drew the jury's attention to Osborn's silence, see Ex parte Payne, supra, nor did the prosecutor invite the jury to make any adverse inference from Osborn's exercise of his right to not testify. Surely, if a defendant attacks the State's case as lacking direct evidence and being only circumstantial, a prosecutor can simply point out that such a situation is not unusual in a murder case and that circumstantial evidence can support a conviction without running afoul of the federal or state constitutions. To hold otherwise is to hamstring the prosecution in any case in which the defendant does not testify and the defendant's attorney attacks the State's evidence -- or lack thereof -- in closing. "Reply in kind" is not just some highbrow legal principle concocted to give law professors something to lecture about; rather, it is a fundamental right of advocates to be able to properly advocate for their clients, including the State.

Moreover, I believe that the main opinion improperly picks out a single half of a sentence in the present case to compare to single

have eyewitness testimony? You have got to go on circumstantial evidence.'"

631 So. 2d at 290 (emphasis added).

50

sentences in other cases without properly comparing the context of all the statements. There should be no "magic words" that necessitate a reversal, such as the prosecutor simply pointing out the obvious fact that the perpetrator and the deceased victim are the only people who know what happened. A juror would not "naturally" and "necessarily" take such a statement to be a comment on the defendant's failure to testify, and, thus, it does not automatically mandate reversal. Instead, context is everything in the analysis of statements such as the one at issue in the present case. In fact, I believe that, since the United States Supreme Court decided <u>Griffin</u> in 1965 and first recognized that a direct comment by the prosecution on the accused's silence is unconstitutional, our jurisprudence in Alabama has become overly simplistic. It has traded closely scrutinizing the entire context of the statements for simply comparing single sentences or even single words to see if they are similar. Now, prosecutors must avoid using these "magic words" regardless of the context. I do not believe that either the state or the federal constitution requires such an outcome. Again, in context, the prosecutor's comments in the present case were merely an argument concerning the validity of

51

circumstantial evidence and a "reply in kind" to the arguments of defense counsel.

## II. Plain-Error Analysis

Further, to the extent that any error occurred, it was not plain error, and, thus, it does not warrant reversal. As stated in the main opinion, "[u]nder the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial." Wilson v. State, 142 So. 3d 732, 751 (Ala. Crim. App. 2010). "Plain error" should be just that -- plain, and clearly error in its context. It is not wrong to say that "plain error" should be error that "jumps off the page," standing out in such a manner that we cannot ignore it. That is simply not the case here.

Because Osborn did not object to the prosecutor's comments at trial, the plain-error standard applies. Further, "the failure to object should be weighed as part of our evaluation of the comments, because the failure to object may suggest that the defense did not consider the comments to be particularly harmful." Ex parte Payne, 683 So. 2d at 465. In the present case, I do not believe that the trial court committed an obvious and indisputable error by allowing the prosecutor's comments without

any objection from the defense. Thus, the prosecutor's comments do not form a basis for the reversal of Osborn's conviction.

### III. Comparison to Other Cases

Lastly, I want to briefly address the only two cases relied on by the main opinion -- Powell v. State, 631 So. 2d 289 (Ala. Crim. App. 1993), and Sykes v. State, [Ms. CR-2022-0546, May 3, 2024] ___ So. 3d ___ (Ala. Crim. App. 2024) (plurality opinion). For the reasons stated above, I believe that Powell is distinguishable from the present case, but, to the extent that it is not, I also believe that it was wrongly decided. When the prosecutor's comments in Powell are compared to prosecutors' comments that were held to be direct comments on the defendant's silence in other cases, Powell appears to be an outlier.

Concerning Sykes, I was a member of the Court of Criminal Appeals when it was decided, but I recused myself from the case. First, Sykes is a plurality opinion and is not controlling precedent. Furthermore, I do not agree with much of the reasoning in Sykes because, again, I believe that the main opinion in that case did not adequately examine the context of the statements, and, in any event, Sykes hinged more completely on a "reply-in-kind" argument.

Most importantly, in both <u>Powell</u> and <u>Sykes</u>, I believe that the Court abdicated its duty to engage in a true contextual analysis of the prosecutors' statements. Absent such a contextual analysis, we risk taking the "easy way out" through a mere cursory examination of the statements standing alone. I believe this kind of overly simplistic approach is what has led to the erroneous jurisprudential pit that we find ourselves in today.

## IV. Conclusion

In conclusion, because I believe that the prosecutor's comments were neither unconstitutional nor rose to the level of plain error, I dissent from the analysis of Part II of the main opinion and the decision to reverse Osborn's capital-murder conviction and death sentence.

KELLUM, Judge, dissenting.

I am troubled by the main opinion's failure to follow statutory law on the appointment and assignment of a special circuit judge; therefore, I disagree with the holding in Part I of the main opinion. My concern is that the orders that professed to give a district judge jurisdiction to preside over a capital-murder case and sentence Jason Michael Osborn to death suffer from defects that I believe cannot be cured with resort to the de facto officer doctrine.

As the main opinion sets out, two orders were issued in this case that are relevant to the determination of whether District Judge Shelly Waters had jurisdiction to preside over Osborn's capital-murder trial. The first order was issued by a presiding judge, and it appointed District Judge Waters as a special circuit judge in the Morgan Circuit Court. The second order was issued by a circuit judge, and it specifically assigned Osborn's case to Judge Waters.

### Standing Order Issued by Presiding Judge on August 3, 2021

The main opinion holds that the standing order appointing District Judge Waters as an acting circuit judge complied with statutory law and

the Alabama Rules of Court. I disagree. This August 3, 2021,[11] order signed by then Presiding Judge Charles B. Elliott, stated: "[District] Judge Shelly Waters is <u>appointed</u> as Special Circuit Judge from this date until <u>January 4, 2023</u>." (Suppl. C. 14) (emphasis added).

Section 12-1-14.1, Ala. Code 1975, provides:

"(a) <u>At the request of the affected judge in a particular circuit, the presiding circuit court judge of the circuit may appoint and commission a special circuit court judge, special district court judge, or special judge of probate for temporary service</u>. The person so appointed shall possess the qualifications of the judgeship to which he or she is appointed. The special judge shall qualify by taking the oath of office prescribed in the Constitution of Alabama of 1901. The appointment shall confer on the special judge all powers, authority, and jurisdiction of the judgeship to which he or she is appointed. The special judge shall not receive compensation for his or her services.

"(b) <u>As used in this section, the term 'temporary service' means not more than 180 consecutive days</u>. A special judge may be reappointed, as needed, for more than one period of 180 consecutive days."

(Emphasis added.) Before § 12-1-14.1 was enacted on September 26, 2001, a presiding judge had no statutory authority to appoint special temporary judges. The Chief Justice of the Alabama Supreme Court also

---

[11]This order is dated August 2, 2021, but is stamped as filed in the Morgan Circuit Clerk's Office on August 3, 2021.

has authority, pursuant to § 12-1-14, Ala. Code 1975, and the Alabama

Constitution, to appoint special judges.

Effective July 1, 2018, the Alabama Legislature also enacted § 12-

9A-8, Ala. Code 1975, which addresses special assignments made by a

presiding circuit judge. This section reads:

> "(a)  <u>A presiding circuit judge, by order, may assign a circuit or district court judge who is within the circuit to serve within the circuit or within the district courts of the circuit</u>. Before assigning a judge, the presiding circuit judge shall evaluate the needs of the circuit, including the currency, congestion, and backlog of criminal and civil cases.
>
> "(b) Assignments of judges by the presiding circuit judge shall be in writing and shall be sent to the assigned judge as soon as practicable.  The presiding judge or the judge's designee may notify the assigned judge orally of the assignment.  An oral notification of an assignment is sufficient until a written notification can be prepared and delivered to the assigned judge.  A copy of each written assignment shall be filed with the Administrative Director of Courts and in the office of the clerk or register of the court to which the assignment is made."[12]

(Emphasis added.)  Section 12-9A-8 does not reference § 12-1-14.1 -- a

2001 statute.  Nor is there any provision in § 12-9A-8 that provides that

it supersedes the 2001 statute.  Section 12-1-14.1 specifically defines the

---

[12]This statute has not been cited in any Alabama appellate-court opinions.  The cases cited in this opinion reference § 12-1-14.1, Ala. Code 1975.

term "temporary appointment," but no specific time period is provided in § 12-9A-8. "[R]ules and statutes relating to the same subject matter must be read in pari materia, thus allowing for legal harmony where possible." State ex rel. Daw, 786 So. 2d 1134, 1136 (Ala. 2000).

I note that Rule 13, Ala. R. Jud. Admin., a rule adopted by the Alabama Supreme Court, also addresses assigning special circuit judges. This rule, as amended effective November 8, 2019, provides:

> "A presiding circuit court judge, by order, may assign a judge who is within the circuit to serve within the circuit courts or within the district courts of the circuit. Before assigning a judge, the presiding circuit court judge shall evaluate the needs of the circuit, including the currency, congestion, and backlog of criminal and civil cases. This assignment shall continue until revoked by the presiding judge or until the assigned judge leaves office, whichever comes first."

(Emphasis added.) The November 2019 amendment removed the word temporary and added the above-emphasized portion to the rule.

The main opinion holds that this 2019 amendment to Rule 13 takes precedence over the enacted statutory law that sets a specific time period for a special appointment. I cannot agree with this conclusion. The Alabama Supreme Court has recognized that when a court rule conflicts with a statute addressing the same subject the "act of the legislature

58

must prevail." <u>Watkins v. Kelley</u>, 262 Ala. 524, 525, 80 So. 2d 247, 248 (1955).[13] The main opinion's interpretation of this rule would extend the jurisdiction of the presiding circuit judge beyond what is set by the Alabama Legislature.

It is my belief that § 12-1-14.1 addresses those situations concerning an extended <u>appointment</u> of a special circuit judge made by a presiding circuit judge. On the other hand, § 12-9A-8 addresses the <u>assignment</u> of a specific case to a judge in a circuit made by the presiding circuit judge.

Section 12-1-14.1(b) clearly states: "[T]he term 'temporary service' means not more than 180 consecutive days. A special judge may be appointed, as needed, for more than one period of 180 consecutive days.'" The standing order appointed Judge Waters for 520 days -- a period far in excess of what is allowed by statute. Moreover, there is no additional

---

[13]While <u>Watkins v. Kelley</u> was a civil case, it has been relied on in criminal cases by both the Alabama Supreme Court and this Court's predecessor, the Alabama Court of Appeals. See <u>Johnson v. State</u>, 269 Ala. 1, 4, 111 So. 2d 610, 613 (1958); <u>Relf v. State</u>, 267 Ala. 3, 5, 99 So. 2d 216, 218 (1957); <u>Jones v. State</u>, 41 Ala. App. 172, 172, 125 So. 2d 278, 279 (1960); <u>Colburn v. State</u>, 40 Ala. App. 248, 251, 112 So. 2d 800, 803 (1959); <u>Granger v. State</u>, 39 Ala. App. 461, 462, 103 So. 2d 835, 836 (1958); <u>King v. State</u>, 39 Ala. App. 167, 167, 98 So. 2d 443, 444 (1957).

order that reappointed Judge Waters to a new 180-day period.[14]   In essence, the order that covered a span of 520 days was not temporary but, instead, was more in the nature of electing a circuit judge, an act clearly beyond the intent of the Legislature.  The main opinion ignores the clear wording of § 12-1-14.1(b).

Even more troubling is that this standing order expired before Osborn's capital-murder trial began.  The standing order named a specific date on which it expired, and that date was January 4, 2023.  Osborn's trial began on February 6, 2023, more than one month after the expiration of the presiding judge's standing order specially appointing District Judge Waters.

<u>Order Issued on September 30, 2022, by Circuit Judge</u>

On September 30, 2022, Circuit Judge Jennifer Howell issued the following order:

> "1. This case is reassigned to Hon. Shelly Waters, who will hear this case as a Special Circuit Judge.  The Clerk is directed to update the file accordingly.
>
> "2. The Motion to Continue Status Conference is GRANTED.

---

[14]This 180-day time limit does not apply to all special appointments. See <u>Dean v. Dean</u>, 295 So. 3d 82, 90 (Ala. Civ. App. 2019) (holding that 180-day time limit does not apply to appointments made by the Chief Justice of the Alabama Supreme Court).

60

> The status hearing is continued from the September 30, 2022, docket and shall be reset by Judge Waters."

(C. 216.) On that same date, an entry was made on the case-action-summary sheet stating: "Changed from: JMH [Jennifer M. Howell] to SSW [Shelley S. Waters]." (C. 6.) There is no other order in the certified record that reassigned this case.[15] Although Judge Howell was the presiding judge of the Morgan Circuit Court at one time, it is uncontested that, at the time that Judge Howell's order was issued, she was not the presiding judge; Judge Elliott was the presiding judge.[16]

The main opinion agrees with the State that the reassignment order issued by Judge Howell was merely a transfer of the case "between judges already serving on the circuit court" and, based on the standing order, was valid. (State's supp. Brief, p. 5.) Osborn cites the case of Ex

---

[15]The State argues that Judge Howell's order was not an order appointing a district judge to sit specially as a circuit judge in Osborn's case. Circuit-court records show that the case was reassigned to Judge Waters on September 30, 2022, the date of Judge Howell's order, and no other order reassigning the case appears in the certified record. Nor was any other order furnished to this Court when the circuit court was directed to supplement the record.

[16]This Court may take judicial notice of the presiding judge of a judicial circuit. See State v. Murphy, 1 So. 3d 1084, 1086 (Ala. Crim. App. 2008).

61

parte K.R., 210 So. 3d 1106 (Ala. 2016), and argues that, even with a standing order issued by the appropriate authority, another individual has no authority to assign a case to a new judge pursuant to that standing order. In Ex parte K.R., the Alabama Supreme Court addressed this issue and stated:

> "In the present case, assuming that the April 28, 2010, order gave the clerk of the probate court the authority to assign the present case to any 1 of the 12 'pre-appointed temporary judges,' Ex parte Knight[, 92 So. 3d 717 (Ala. 2011),] indicates that such a practice is improper when the authorizing statute gives the power to appoint solely to the presiding judge of a circuit court. Section 13A-5-9.1 and § 1(a) of Act No. 2007-454 similarly require that the presiding judge of the circuit court appoint a judge when necessary."

210 So. 3d at 1118.

Based on the clear language of § 12-9A-8, the statutory authority to assign or reassign a case in circuit court is vested solely with the presiding circuit judge. Judge Howell had no authority to reassign the case to another judge because, at the time the September 2022 order was issued, she was not the Presiding Judge of the Morgan Circuit Court.

Preservation of Issue

The main opinion further appears to agree with the State that the issue of Judge Waters's appointment is not properly preserved because

this issue was not raised at trial and does not involve the jurisdiction of the court. I do not agree. The Alabama Supreme Court in <u>Ex parte Files</u>, 413 So. 3d 679 (Ala. 2024), recently discussed the holdings in <u>Ex parte K.R.</u>, supra, and <u>Bush v. State</u>, 171 So. 3d 679 (Ala. Crim. App. 2014), as they related to a presiding judge appointing his successor after he had recused himself from a case. The Alabama Supreme Court specifically noted:

> "Both <u>Ex parte K.R.</u> and <u>Bush</u> are legally distinguishable from this case. Those cases, respectively, dealt with specific statutes governing who may be appointed to fill a judicial vacancy or which judge may hear a particular case. This statutory basis for holding that the lower courts in those cases lacked jurisdiction is significant: the legislature has the power to regulate a circuit court's subject-matter jurisdiction. Ala. Const. 2022, art. VI, § 142(b)."

<u>Ex parte Files</u>, 413 So. 3d at 685. As the language in <u>Ex parte Files</u> recognizes, the appointment of a special circuit judge is governed by statutory law, is an issue that involves the subject-matter jurisdiction of a court, and is jurisdictional.

> "Jurisdiction is '[a] court's power to decide a case or issue a decree.' <u>Black's Law Dictionary</u> 867 (8th ed. 2004). Subject-matter jurisdiction concerns a court's power to decide certain types of cases. <u>Woolf v. McGaugh</u>, 175 Ala. 299, 303, 57 So. 754, 755 (1911) ('"By jurisdiction over the subject-matter is meant the nature of the cause of action and of the relief sought."' (quoting <u>Cooper v. Reynolds</u>, 77 U.S. (10 Wall.) 308,

316, 19 L.Ed. 931 (1870))). That power is derived from the Alabama Constitution and the Alabama Code. See <u>United States v. Cotton</u>, 535 U.S. 625, 630-31, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (subject-matter jurisdiction refers to a court's 'statutory or constitutional power' to adjudicate a case). In deciding whether Seymour's claim properly challenges the trial court's subject-matter jurisdiction, we ask only whether the trial court had the constitutional and statutory authority to try the offense with which Seymour was charged and as to which he has filed his petition for certiorari review."

<u>Ex parte Seymour</u>, 946 So. 2d 536, 538 (Ala. 2006).

A jurisdictional issue may not be waived by a party's failure to raise the issue. Indeed, this Court has a duty to notice all jurisdictional issues <u>ex mero motu</u>. The "'lack of subject matter jurisdiction may not be waived by the parties and it is the duty of an appellate court to consider lack of subject matter jurisdiction ex mero motu.'" <u>Ex parte Berry</u>, 999 So. 2d 883, 888 (Ala. 2008) (quoting <u>Ex parte Smith</u>, 438 So. 2d 766, 768 (Ala. 1983)). See also <u>Looney v. State</u>, 60 So. 3d 293, 298 (Ala. Civ. App. 2010).

The State further argues: "It must be presumed that Judge [Howell] issued her order at the instruction or with the consent of Presiding Circuit Judge Elliott." (State's supp. Brief, p. 6.) "'This court may presume that a court of general jurisdiction,' rather than a court of

limited jurisdiction such as a probate court, 'has subject-matter jurisdiction over a particular action.'" Ex parte R.D., 313 So. 3d 1119, 1129 (Ala. Civ. App. 2020) (citation omitted). However, a district court is not a court of general jurisdiction but a court of limited jurisdiction. See § 12-12-32, Ala. Code 1975, which provides, in pertinent part:

> "(b)(1) The district court may exercise original jurisdiction concurrent with the circuit court to receive pleas of guilty in prosecutions of offenses defined by law as felonies not punishable by sentence of death.
>
> "(b)(2) The district court shall have jurisdiction to hold preliminary hearing in prosecutions for felonies as provided for in Title 15 of this code."

Because the district court is a court of limited jurisdiction, this Court cannot presume that a district judge has jurisdiction over a capital-murder trial. Without a proper order of appointment, I believe that District Judge Waters had no subject-matter jurisdiction to preside over Osborn's capital-murder trial and sentencing.

De Facto Officer Doctrine

The main opinion also holds that the de facto officer doctrine renders District Judge Waters's consideration of Osborn's case lawful.

"The de facto officer doctrine confers validity upon acts performed by a person acting under the color of official title even though it is later

discovered that the legality of that person's appointment or election to office is deficient." Ryder v. United States, 515 U.S. 177, 180 (1995). The Alabama Supreme Court recognized this doctrine as it applied to judges in 1905.[17] "The proposition of law is well settled by adjudications, not only of this court, but courts of other jurisdictions, that the proceedings and judgments of a court presided over by a de facto officer are not void." See Walker v. State, 142 Ala. 7, 10, 39 So. 242, 242 (1905). This doctrine was codified in Alabama with the adoption of § 36-1-2, Ala. Code 1975.[18]

In Benjamin v. State, 156 So. 3d 424 (Ala. Crim. App. 2013), a case relied on by the State, the defendant argued that the circuit judge who presided over his case did not have jurisdiction to hear the case because, he said, "the statute governing special appointment of a judge, § 12-1-

---

[17]It appears that, in Alabama, the de facto officer doctrine was first recognized in 1884 when the Alabama Supreme Court applied the doctrine to a notary public who signed an arrest warrant. See Cary v. State, 76 Ala. 78 (1884).

[18]This code section states, in pertinent part:

"The official acts of any person in possession of a public office and exercising the functions thereof shall be valid and binding as official acts in regard to all persons interested or affected thereby, whether such person is lawfully entitled to hold office or not and whether such person is lawfully qualified or not. …"

14.1, Ala. Code 1975, provides only that judges may be appointed for 'temporary service' not to exceed 180 days and ... the judge in this case presided over his trial and sentencing for more than 6 years." 156 So. 3d at 458. After noting that the judge had been appointed by the Chief Justice of the Alabama Supreme Court and that every year the Chief Justice issued a new order of appointment, this Court stated:

> "Regardless of whether the appointment was lawful, the Alabama Supreme Court has recognized that a judge who serves in a similar capacity without objection is a de facto officer. In Gwin v. State, 808 So. 2d 65 (Ala. 2001), the Alabama Supreme Court reversed this Court's judgment holding that the appointment of the trial judge in the case was invalid because that judge did not reside in the same county. In setting aside this Court's judgment, the Supreme Court stated:
>
> > "'Gwin did not object to [the special judge's] appointment before the judgment of conviction and sentence was entered. [The special judge], who was holding the office of circuit judge and was exercising the functions thereof, was a de facto officer when he accepted Gwin's plea. "'A de facto officer is one who exercises the duties of a de jure office under color of appointment or election....'" Dixie Dairies v. Alabama State Milk Control Bd., 286 Ala. 198, 202, 238 So. 2d 551, 554 (1970) (quoting Ex parte Register, 257 Ala. 408, 413, 60 So. 2d 41, 46 (1952)). Section 36-1-2, Ala. Code 1975, which protects the actions of de facto officers, reads:
> >
> > > "'"The official acts of any person

67

in possession of a public office and exercising the functions thereof shall be valid and binding as official acts in regard to all persons interested or affected thereby, whether such person is lawfully entitled to hold office or not and whether such person is lawfully qualified or not...."

"'(Emphasis added.) The judgment Gwin appealed from is valid and remains intact as an action of a de facto officer protected by statute.'

"808 So. 2d at 67.

"This appears to be the first time Benjamin has objected to Judge White's presiding over his trial and sentencing. Pursuant to Gwin v. State, because Judge White served without objection he was a de facto officer protected by statute. Thus, this claim was correctly summarily dismissed as it failed to state a claim upon which relief could be granted. See Rule 32.7(d), Ala. R. Crim. P."

Benjamin, 156 So. 3d at 459.

The appointment in Benjamin was made by the Chief Justice of the Alabama Supreme Court. The Alabama Court of Civil Appeals noted in Dean v. Dean, 295 So. 3d 82 (Ala. Civ. App. 2019):

"[A]lthough a presiding circuit judge's authority to appoint and commission a special circuit-court judge for 'temporary service' is limited to periods of 180 consecutive days in each instance, see Ala. Code 1975, § 12-1-14.1(b), we find no such temporal limitation upon the authority of the chief justice to assign a retired circuit judge in § 12-18-7[, Ala. Code 1975,] or in [Art. VI,] § 149 [of the Alabama Constitution]."

295 So. 3d at 89-90. The holding in <u>Benjamin</u> is, thus, distinguishable from this case. The Chief Justice's power to appoint a special circuit judge is broader than the power given to a presiding circuit judge. Also, the appointment order in <u>Benjamin</u> was issued by the person statutorily authorized to issue that order.

The other Alabama cases cited by the State to support application of the de facto officer doctrine are also distinguishable from this case. Two of the cases are cases in which the Chief Justice appointed the special judge. See <u>Dean v. Dean</u>, 295 So. 3d at 88 ("[T]he retired circuit judge's actions during the 'assignment gap' fall within the parameters of the <u>de facto</u> officer doctrine." The judge had been specially appointed by the Chief Justice.); <u>Gwin v. State</u>, 808 So. 2d 65 (Ala. 2001) (holding that, although a special judge was not a resident of the county of appointment, the appointment was lawfully made by the Supreme Court). As already noted, the time limitation is not contained in the statute authorizing the Chief Justice to make a special appointment. See <u>Dean v. Dean</u>, 295 So. 3d at 89-90. The other cases deal with appointments to administrative agencies. See <u>Dixie Dairies v. Alabama State Milk Control Bd.</u>, 286 Ala. 198, 202, 238 So. 2d 551, 554 (1970) ("Although the legislature at the time

69

the Board sat in judgment had passed an act providing for a six-member Board, the appointments to office authorized had not been made. The five members of the Board continued to act under their original appointments. They lawfully sat in judgment as de facto officers and Board members."); Walker v. State, 142 Ala. 7, 11, 39 So. 242, 243 (1905) ("[T]he defendant was arraigned, and a day set for a trial, at a time different from that fixed by law for the holding of the court, and therefore at a time not authorized by law. This being the case, it follows that the indictment was void, as well as the arraignment and the order setting the day for the trial; and this is so whether the judge presiding be an officer de jure or de facto, and for this reason the judgment of conviction was erroneous, which error necessarily works reversal of the case.").

The Alabama Supreme Court has not blindly applied the de facto officer doctrine without regard to the underlying facts of the case and the underlying validity of the appointment or assignment order. In Ex parte K.R., supra, the Alabama Supreme Court considered a petition for a writ of mandamus after the probate judge recused himself and the clerk of that circuit appointed a Mobile County attorney to sit specially on an adoption case. In the mandamus proceeding, the petitioner challenged

70

the order issued by the attorney. The Supreme Court, after finding that the issue was properly before that Court because it involved a jurisdictional defect, stated:

> "The appointment of a temporary probate judge in instances when the regularly elected probate judge cannot serve is governed by § 12-1-14.1 and § 12-13-37, Ala. Code 1975. Section 12-1-14.1(a) states, in pertinent part: 'At the request of the affected judge in a particular circuit, the presiding circuit court judge of the circuit may appoint and commission a ... special judge of probate for temporary service.' Section 12-1-14.1 allows the presiding circuit court judge to appoint a temporary probate judge when requested to do so by the probate judge who is unable to sit on the case. In the present case, pursuant to § 12-1-14.1, the presiding circuit court judge of the Mobile Circuit Court had the authority to appoint a temporary probate judge once Judge Davis recused himself, upon being asked to do so by Judge Davis.
>
> "....
>
> "In the present case, it is undisputed that neither the Chief Justice of this Court nor the presiding judge of the Mobile Circuit Court was notified of Judge Davis's recusal. Instead of certifying the fact of Judge Davis's recusal to the Chief Justice of the Alabama Supreme Court or to the presiding judge of the Mobile Circuit Court and then allowing either the Supreme Court or the presiding judge of the Mobile Circuit Court to appoint a temporary probate judge, the clerk of the probate court purported to appoint Druhan as a temporary probate judge to replace Judge Davis. We have not been able to locate any law giving the clerk of the probate court the authority to appoint a temporary probate judge. As a result, Druhan was never properly appointed as a temporary probate judge. Accordingly, Druhan had no

71

authority to enter the orders he entered, and any order entered by Druhan is void. See Ex parte Punturo, 928 So. 2d 1030, 1034 (Ala. 2002) ('A judgment issued by a trial court without jurisdiction is a nullity. Ex parte Hornsby, 663 So. 2d 966 (Ala. 1995), and Moore v. Ashe, 269 Ala. 359, 113 So. 2d 678 (1959).')."

Ex parte K.R., 210 So. 3d at 1112-13.

In Bush v. State, supra, the defendant filed a motion to reconsider his sentence under former § 13A-5-9.1, Ala. Code 1975. On rehearing, the argued that the circuit judge who ruled on that motion did not have jurisdiction because, he said, the judge was not the sentencing judge or the presiding judge of that circuit. We stated:

"Although Bush correctly filed his motion in the Mobile Circuit Court, it does not appear that Judge Youngpeter was the judge who sentenced Bush nor is he the presiding judge of the 13th Judicial Circuit. See Ex parte Bush, 270 Ala. 62, 116 So. 2d 382 (1959) (noting that this Court can take judicial notice of the identity of the presiding judge in a particular circuit). Further, the record was silent regarding Judge Youngpeter's appointment to rule on Bush's Kirby [v. State, 899 So. 2d 968 (Ala. 2004),] motion. See § 13A-5-9.1, Ala. Code 1975 (providing that the sentencing judge or 'any circuit judge appointed by the presiding judge' may rule on a Kirby motion). Thus, in accordance with Rule 10(g), Ala. R. App. P., this Court ordered the circuit court to file a supplemental record containing a copy of the order appointing Judge Youngpeter to preside over Bush's motion or, in the alternative, to advise this Court if such an order was not entered.

"On September 8, 2014, the circuit court filed a

72

supplemental record with this Court. In that record, Judge Youngpeter stated that there was no order appointing him to preside over Bush's latest <u>Kirby</u> motion but that '[i]t is the customary practice in the Thirteenth Judicial Circuit for an incoming circuit judge to 'take over' the responsibility of handling the cases previously assigned to the departing circuit judge. That is what occurred with respect [to] the above-referenced case.' (Supplemental Record, C. 9.) This Court recognizes that the current customary practice in the 13th Judicial Circuit is often used in many circuits in this State; however, in many circuits, the presiding judge has issued a standing administrative order adopting that procedure. In <u>Owens v. State</u>, 39 So. 3d 1183 (Ala. Crim. App. 2009), this Court held that such a standing order by the presiding circuit judge was sufficient to constitute a valid appointment of a circuit judge under § 13A-5-9.1 to hear a <u>Kirby</u> motion. Compare <u>Knight v. State</u>, 92 So. 3d 717 (Ala. 2011) (holding that an administrative order containing language allowing the circuit clerk discretion in assigning motions to various judges did not constitute a valid judicial appointment under § 13A-5-9.1).

"In this case, however, the record does not show, and the circuit court did not provide any documents establishing that Judge Youngpeter had jurisdiction to rule on Bush's motion. Therefore, we must find that the circuit court's order denying Bush's motion was void because that court did not have jurisdiction to entertain the motion. A void judgment will not support an appeal; therefore, this Court must dismiss Bush's appeal."

<u>Bush</u>, 171 So. 3d at 680-81.

My research has revealed no Alabama case that has applied this doctrine to the appointment or assignment of a district judge to preside over a capital-murder case. Unlike the main opinion, I believe that the

73

cases issued in Alabama concerning the de facto officer doctrine are consistent with federal law on the de facto officer doctrine. Because Alabama has not addressed the specific issue involved in this case, I believe that a review of federal caselaw is useful in evaluating this issue.

In Wrenn v. District of Columbia, 808 F.3d 81 (D.C. Cir. 2015), the federal court stated:

> "Although we are satisfied the statutes clearly determine on their face that Judge Scullin had no authority to decide this matter, there is also clear precedent compelling that result. In Frad v. Kelly, 302 U.S. 312, 58 S.Ct. 188, 82 L.Ed. 282 (1937), a district judge sat as a visiting judge under a designation for a specified period of time. After the expiration of that time, he issued an order in a case which he had previously heard in the visited district. Id. at 313, 58 S.Ct. 188. The Supreme Court concluded that the order was 'null' because the judge by that time had no authority in the district in which he issued the order. Id. at 316, 58 S.Ct. 188.

> "The Court explained that while a visiting judge could 'perform the functions which are incidental and supplementary to the duties performed by him while present and acting in the designated district,' neither the statute nor the designation empowered him to act beyond the temporal limitations under which he was designated. Id. at 316-17, 58 S.Ct. 188. In explaining its holding, the Court noted that the statutory limitations on the authority of visiting judges are jurisdictional. See id. at 319, 58 S.Ct. 188.

> "We conclude that Frad controls this case. Like the designated judge in Frad, Judge Scullin had a limited designation that did not extend beyond the specifications of that designation. In Frad, the breached limitation was

74

temporal; in this case, it is case designation. In either case, a judge acting beyond his designation acts without jurisdiction. Appellees argue that the de facto officer doctrine supports Judge Scullin's jurisdiction, but that doctrine does not apply. The de facto officer doctrine applies in the context of technical defects and confers validity upon acts performed by a person acting under color of official title, even if it is later determined that the title is deficient. Nguyen v. United States, 539 U.S. 69, 77-78, 123 S.Ct. 2130, 156 L.Ed.2d 64 (2003). The designation for specific cases is not a technical matter. It is in fact jurisdictional.

"We realize that we are undoing the work of litigation to date, but we have no choice. As the Supreme Court noted in Frad, an order entered by a judge without jurisdiction is 'null.'"

808 F. 3d at 83-84.

One federal court has stated the following concerning the holding in Wrenn and the case relied on by that court, Frad v. Kelly, 302 U.S. 312 (1937):

"This case is unlike two cases [the appellant] cites, Wrenn v. District of Columbia, 808 F.3d 81 (D.C. Cir. 2015), and Frad v. Kelly, 302 U.S. 312, 58 S.Ct. 188, 82 L.Ed. 282 (1937). In Wrenn, we vacated an order entered by a visiting judge designated to hear certain specified cases because the order was issued in a case beyond the ones identified in the designation. See 808 F.3d at 83-84. In contrast, neither of Judge Rothstein's pertinent designations was limited to particular cases. The visiting judge in Frad v. Kelly sat by designation for a limited time period. Frad, 302 U.S. at 316, 58 S.Ct. 188. The Supreme Court found that the judge had no authority, after his designation expired, to revoke the probation of a defendant he had tried while sitting by

designation because the trial had already been 'concluded by the judgment of sentence.' Id. at 317, 58 S.Ct. 188."

Clemente v. Federal Bureau of Investigation, 867 F.3d 111, 116 (D.C. Cir. 2017).

The United States Supreme Court, in Nguyen v. United States, 539 U.S. 69 (2003), addressed the application of the de facto officer doctrine to the judicial appointment of an Article IV judge to a three-judge panel for the United States Court of Appeals to hear the appeal of Nguyen's drug-related convictions. That Court stated:

"The de facto officer doctrine, we have explained, 'confers validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient.' Ryder v. United States, 515 U.S. 177, 180, 115 S.Ct. 203, 132 L.Ed.2d 136 (1995). Whatever the force of the de facto officer doctrine in other circumstances, an examination of our precedents concerning alleged irregularities in the assignment of judges does not compel us to apply it in these cases.

"Typically, we have found a judge's actions to be valid de facto when there is a 'merely technical' defect of statutory authority. Glidden Co. v. Zdanok, 370 U.S. 530, 535, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962) (plurality opinion of Harlan, J.). In McDowell v. United States, 159 U.S. 596, 601-602, 16 S.Ct. 111, 40 L.Ed. 271 (1895), for example, the Court declined to notice alleged irregularities in a Circuit Judge's designation of a District Judge for temporary service in another district. See also Ball v. United States, 140 U.S. 118, 128-129, 11 S.Ct. 761, 35 L.Ed. 377 (1891) (assigned judge had de facto

authority to replace a deceased judge even though he had been designated to replace a disabled judge). We observed in <u>McDowell</u>, however, that the judge whose assignment had been questioned was otherwise qualified to serve, because he was 'a judge of the United States District Court, having all the powers attached to such office,' and because the Circuit Judge was otherwise, empowered to designate him. 159 U.S., at 601, 16 S.Ct. 111."

539 U.S. at 77-80.

I believe that the defects in the two orders were not mere technical defects that would justify application of the de facto officer doctrine. The standing order issued by the presiding judge was invalid because it exceeded the period permitted by statute and expired before the start of Osborn's trial. Also, Judge Howell's order assigning the case to a district judge was issued in violation of § 12-9A-8 and was an act outside the scope of her jurisdiction because she was not the presiding judge. I further note that the de facto officer doctrine was applied to the cases cited above because no objection was made to the special judge's appointment. However, this Court continues to apply the plain-error standard of review in appeals in death-penalty cases, see <u>Iervolino v. State</u>, 402 So. 3d 844 (Ala. Crim. App. 2023), and Rule 45A, Ala. R. App. P., and at least one federal court has held that the plain-error standard

impacts the application of the de facto officer doctrine.[19]

After reviewing the record, I am confident that this case will not withstand the many levels of appellate review that attach to a capital-murder conviction and sentence of death. "A judgment entered by a court lacking subject-matter jurisdiction is absolutely void and will not support an appeal; an appeal court must dismiss an attempted appeal from such a void judgment." Vann v. Cook, 989 So. 2d 556, 559 (Ala. Civ. App. 2008).

Because I would dismiss this appeal for the above reasons, I respectfully dissent.

---

[19]The United States Supreme Court in Nguyen, supra, specifically noted that "to ignore the violation of the designation statute in these cases would incorrectly suggest that some action (or inaction) on petitioners' part could create authority Congress has quite carefully withheld." 539 U.S. at 80.